Chemical Natural Resources, Inc. *v.* Republic of Venezuela, Appellant.
Republic of Venezuela, Petitioner, *v.* Milner.

Argued May 25, 1965. Before BELL, C. J., MUSMAN-NO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Thomas F. Mount,* with him *Rawle & Henderson,* and *William A. Dobrovir, Paul D. Hardy, Howard C. Westwood, B. Scott Custer, Jr.,* and *Covington & Burling,* of the Washington, D. C. Bar, for appellant.

*Abraham E. Freedman,* with him *Martin J. Vigderman,* and *Freedman, Borowsky and Lorry,* for appellees.

*I. Raymond Kremer,* for respondents.

OPINION BY MR. CHIEF JUSTICE BELL, January 4, 1966:

The Republic of Venezuela* (1) took an appeal, pursuant to the Act of March 5, 1925, P. L. 23 (12 P.S. §672 et seq.), from an Order of the Court below which decided it had jurisdiction of plaintiffs' action of assumpsit, commenced by foreign attachment, and (2) filed in this Court an application petitioning this Court to issue a writ of mandamus or prohibition, or both, and dismiss plaintiffs' action against it.

The principal question involved in each case is the legal effect of a Suggestion of Immunity made by the Department of State. The two actions were consolidated here and will be considered together in this Opinion.

## Facts and Averments

Chemical Natural Resources, Inc.,** and Venezuelan Sulphur Corporation, C.A.*** sued Venezuela in an action of assumpsit commenced by a writ of foreign attachment which in this case is an action quasi in rem.**** Chemical is a Delaware Corporation of which not less than 50 percent of its stock is beneficially

---

* hereinafter called Venezuela.
** hereinafter called Chemical.
*** hereinafter called Sulphur.
**** As to an action quasi in rem, see *Freeman v. Alderson,* 119 U.S. 185, 187; *Hamilton Equipment, Inc. v. Onamia Corp.,* 411 Pa. 525, 192 A. 2d 734; *Fairchild E. & A. Corp. v. Bellanca Corp.,* 391 Pa. 177, 137 A. 2d 248; cf. also *Falk & Co. v. South Texas Cotton Oil Co.,* 368 Pa. 199, 82 A. 2d 27.

owned by United States citizens. Sulphur is a corporation organized under the laws of Venezuela and is a wholly owned subsidiary of Chemical.

On October 21, 1963, the plaintiffs (Chemical and Sulphur) commenced their action of assumpsit against Venezuela by filing a (praecipe for a) writ of foreign attachment (together with a complaint) under which writ the sheriff was directed to attach and seize the S.S. Ciudad de Valencia, allegedly the property of defendant Venezuela, which was then in the Port of Philadelphia and in the custody of Stockard Shipping and Terminal Corp.* The complaint demanded damages in the sum of $116,807,258.28.

On October 22, 1963, the day after the writ was issued, the sheriff attached and seized the steamship and took it into his possession. He also served copies of plaintiffs' complaint on the ship's master and on Stockard as garnishee. However, two days later, on October 24, 1963, *the attachment was dissolved without prejudice* upon the order of plaintiffs' attorney.**

Plaintiffs' pertinent allegations in its amended complaint may be thus summarized:

In April of 1952 the plaintiffs, acting through Sulphur, purchased all mineral rights and interest or denouncements*** located in the Municipality of El Pilar, State of Sucre, Venezuela. Solely by reason of plaintiffs' exploitation, reservoirs of mineral-laden geothermal steam were discovered in El Pilar. Subsequent-

---

* hereinafter called Stockard.

** The docket entries, both as recorded and as printed, erroneously state that by such order, "this *suit* is dissolved only without prejudice."

*** *Denouncement* is defined in Black's Law Dictionary, 3d ed., as meaning, in Mexican mining law, "an application to the authorities for a grant of the right to work a mine, either on the ground of new discovery or of forfeiture of the rights of a former owner through abandonment or illegal operation."

ly, plaintiffs through Sulphur entered into several contracts with a department of the Venezuelan Government under which, inter alia, plaintiffs agreed to erect facilities for converting the steam into electrical power and defendant agreed to purchase the resulting power. Plaintiffs expended large sums of money in order to carry out their part of the contract. Thereafter, Venezuela unilaterally and without any justifiable cause cancelled the contract and confiscated plaintiffs' property and property rights with a resulting loss to plaintiffs of over $116,000,000. Plaintiffs further averred that Venezuela operates its merchant vessels, including the ship which was seized, through a nationalized company wholly owned by Venezuela, and thus was engaged in a commercial and private or proprietary capacity as distinguished from a Governmental or public capacity. Plaintiffs further averred that they could not obtain Justice in any Venezuelan Court.

Venezuela has never entered a general appearance in this action, but improperly entered a special appearance for the purpose of challenging the jurisdiction of the Court of Common Pleas. However, Venezuela, more importantly and properly, challenged the jurisdiction of the Court by filing preliminary objections to plaintiffs' complaint and writ of foreign attachment.* On December 5, 1963, Venezuela averred in its preliminary objections (a) that plaintiffs did not have a cause of action, and (b) that the Courts of Venezuela are available to the plaintiffs to assert any claim they may have, and (c) that the vessel allegedly operated by the nationalized Company is not, in fact, the property of Venezuela, and (d) that under the principle or doctrine of Sovereign Immunity the Court below could not ob-

---

* See Pa. R. C. P. 1017(b) ; *Williams Co. v. Pancoast Company,* 412 Pa. 166, 170, 194 A. 2d 189; cf. also *Monaco v. Montgomery Cab Co.,* 417 Pa. 135, 138, 208 A. 2d 252.

tain jurisdiction through an action quasi in rem. Plaintiffs filed an answer which denied virtually all of Venezuela's material averments of fact and conclusions of law.

Venezuela also sought and obtained the intervention of the United States Department of State which, by the United States Attorney for the Eastern District of Pennsylvania acting under orders of the Attorney General of the United States, filed a "Suggestion of Immunity", *which included a prayer to dismiss plaintiffs' action. against Venezuela* because of a certification of Sovereign Immunity which was recognized and allowed by the Department of State. The Attorney General acted upon a request received from the Legal Adviser of the State Department dated January 13, 1964—after all parties had been wisely given a hearing by the Legal Adviser both on the facts and the law—reading pertinently:

"The Department recognizes and allows the sovereign immunity of the Republic of Venezuela, defendant in the above suit, from the jurisdiction of the Court of Common Pleas of Philadelphia County, Pennsylvania, and it will be appreciated if appropriate instructions can be issued to the United States Attorney in that jurisdiction to file a suggestion of immunity with the Court."*

On December 18, 1964, the Court below entered the following Order: "In re the Suggestion of Immunity

"AND NOW, this 18th day of December, 1964, in re the Suggestion of Immunity, the motion of the defendant, the Republic of Venezuela, to dismiss the complaint is overruled, with leave to the defendant to file an answer within thirty days from date of this Order."

What the Court apparently intended to do was to deny the State Department's prayer and Venezuela's motion to dismiss (which was contained in its prelimi-

---

* This has become the customary procedure.

nary objections), *basing its denial on its determination that Venezuela was not entitled to Sovereign Immunity.* Venezuela then took a timely appeal to this Court under §3 of the Act of March 5, 1925, supra.

Thereafter (on March 8, 1965), Venezuela, we repeat, filed in this Court a petition for a writ of mandamus or, in the alternative, a writ of prohibition, or both, naming as respondents Judges Milner and Ullman. These Judges duly filed an answer opposing a grant of the writ and this Court ordered argument on the merits of the petition and answer at the time of oral argument on Venezuela's appeal. Briefs, counter-briefs, supplemental briefs and reply briefs were filed by some or all of the parties in one or both of these cases and have been carefully studied by us.

## Jurisdiction re Foreign Attachment

The Court below undoubtedly acquired jurisdiction by service of the writ of foreign attachment upon the captain of the vessel, and its jurisdiction was not subsequently divested or lost as a result of plaintiffs' voluntary dissolution of the (foreign) attachment without prejudice. Cf. *Ex Parte Peru,* 318 U.S. 578 and Pa. R. C. P. 1272. For reasons hereinafter appearing we deem it unnecessary to decide whether on the present complicated and controversial record, with so many conflicting averments, Venezuela's preliminary objections could be sustained. Cf. Pa. R. C. P. 1030 and 1017(b)(1) and 1028(c).

We shall proceed to discuss the very important and crucial question of Sovereign Immunity which, we repeat, was raised (1) in Venezuela's preliminary objections and (2) also in its petition for a writ of mandamus or prohibition or both, as well as in the State Department's Suggestion of Immunity, and which the parties themselves consider the principal question in these cases.

Appeal

Venezuela's appeal which, under the Act of 1925,* challenges the jurisdiction of the lower Court, cannot be sustained and must be quashed. It is important to note that the Order of the lower Court overruled Venezuela's motion to dismiss the complaint "with leave to the defendant to file an answer within thirty days. . .". This is an interlocutory Order,** and an appeal under the Act of 1925 raises only questions of jurisdiction, as that term has been interpreted and defined by the Courts. *Vendetti v. Schuster,* 418 Pa. 68, 208 A. 2d 864; see also *University Sq. No. 1, Inc. v. Marhoefer,* 407 Pa. 257, 180 A. 2d 427; *Simpson v. Simpson,* 404 Pa. 247, 172 A. 2d 168; *McGinley v. Scott,* 401 Pa. 310, 164 A. 2d 424; *County Const. Co. v. Livengood Const. Corp.,* 393 Pa. 39, 142 A. 2d 9; *Welser v. Ealer,* 317 Pa. 182, 176 A. 429.

In the *Vendetti* case the defendant, a surgeon employed by the Government in a veterans hospital, moved to dismiss a malpractice suit brought against him by a patient on the ground that, as such surgeon *he was immune from suit*** for negligent conduct. The lower Court dismissed his motion. This Court quashed the appeal, holding that the lower Court's Order was interlocutory and was not appealable under the Act of 1925. In its Opinion the Court said (page 71):

"Even if the defendant is in fact immune from suit as he contends, the Court below *undoubtedly had jurisdiction of the cause of action**** because it has the jurisdiction and power to inquire into actions of trespass. In McWilliams v. McCabe, 406 Pa. 644, 179 A.

---

\* Act of March 5, 1925, P. L. 23.

\*\* An appeal from some Orders which are not final is sometimes allowed by Statute.

\*\*\* Just like Venezuela's claim to be immune in this suit.

\*\*\*\* Italics throughout, ours.

2d 222, the Court said (page 648) : '. . . ". . . the test for determining whether a court has jurisdiction of the subject matter *is the competency of the court to determine controversies of the general class to which the case presented for its consideration belongs, and the controlling question is whether the court had power to enter upon the inquiry,* not whether it might ultimately decide that it was unable to grant the relief sought in the particular case. . . ." [citing numerous cases].' "

Sovereign Immunity is in the nature of an affirmative defense; (a) it does not go to jurisdiction and (b) it can be waived. For example, *a Court unquestionably has jurisdiction* (1) whenever a foreign Sovereign brings suit, and (2) whenever a foreign Sovereign interposes a set-off or counterclaim: *National City Bank v. Republic of China,* 348 U.S. 356; *Mexico v. Hoffman,* 324 U.S. 30; *Guaranty Trust Company v. U.S.,* 304 U.S. 126. In such cases, a Sovereign cannot successfully challenge jurisdiction; indeed, the plea of Sovereign Immunity, even when pleaded by a Sovereign or by one of its corporations or instrumentalities, is not an absolute defense unless accompanied by the State Department's Suggestion of Immunity: *Mexico v. Hoffman,* 324 U.S., supra (pp. 34, 35). As the Supreme Court in those cases (and in a number of other cases) stated, the question is not whether the Court had jurisdiction—which it had—but *whether the jurisdiction which the Court had acquired should be relinquished* for diplomatic reasons in order to promote our foreign relations or to prevent a possible war. *Ex Parte Peru,* 318 U.S., supra; *Mexico v. Hoffman,* 324 U.S., supra; *Campania Espanola v. Navemar,* 303 U.S. 68, 76; *Sullivan v. State of Sao Paulo,* 122 F. 2d 355, 360; *Rich v. Naviera Vacuba S.A.,* 295 F. 2d 24; *Stone Eng. Co. v. Petroleos Mexicanos,* 352 Pa. 12, 42 A. 2d 57.

The contention that the question of jurisdiction is governed by our decisions in the NLRB cases is erroneous. In those cases, Congress has delegated to the NLRB *exclusive jurisdiction* in certain labor disputes, with the result that in cases involving such disputes (a) the field has been pre-empted by the Federal Government, and (b) State Courts have no jurisdiction, and (c) Orders dismissing preliminary objections will be reversed: *Terrizzi Beverage Co. v. Local Union No. 830,* 408 Pa. 380, 184 A. 2d 243; *Marine Engineers v. Interlake Co.,* 370 U.S. 173. For exceptions, see *City Line Open Hearth v. Hotel M. & C.E.,* 413 Pa. 420, 197 A. 2d 614, holding that State Courts may restrain violence even when committed in such labor disputes.

Furthermore, the law is well established that jurisdiction of the subject matter cannot be conferred by waiver or by consent of the parties where no jurisdiction exists: *Bell Appeal,* 396 Pa. 592, 152 A. 2d 731; *Seligsohn Appeal,* 410 Pa. 270, 189 A. 2d 746.

It is clear, therefore, that in the instant case, the lower Court had jurisdiction, and an appeal under the Act of 1925 will not lie.

However, Venezuela, we repeat, filed in this Court a petition for mandamus and a petition for a writ of prohibition.

## Mandamus and Prohibition

Under Section 3, Article V, of our State Constitution, this Court has been specifically granted original jurisdiction to issue writs of mandamus addressed to Courts of inferior jurisdiction. On the other hand, writs of prohibition are issued by this Court on the basis of its King's Bench powers which it inherently possesses and which were specifically granted to the Court by the Act of May 22, 1722, 1 Sm. L. 131, and were confirmed and enlarged by §1 of the Act of June

16, 1836, P. L. 784 (17 P.S. §41). *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 61 A. 2d 426; cf. also, *Commonwealth v. Onda,* 376 Pa. 405, 103 A. 2d 90; *Commonwealth v. Caplan,* 411 Pa. 563, 192 A. 2d 894.

In *Carpentertown Coal & Coke Co.,* supra, the law pertaining to writs of prohibition was extensively reviewed. The Court held that the power to issue the prerogative writ of prohibition is an inherent power of this Court which was established by the first of the two Acts above mentioned, and was not taken away by the Constitution of 1874. The Court pertinently said (page 102) : ". . . The writ of prohibition is one which, like all other prerogative writs, is to be used only with great caution and forbearance and as an extraordinary remedy in cases of extreme necessity, to secure order and regularity in judicial proceedings if none of the ordinary remedies provided by law is applicable or adequate to afford relief. It is a writ which is not of absolute right but rests largely in the sound discretion of the court. It will never be granted where there is a *complete and effective remedy* by appeal, certiorari, writ of error, injunction, or otherwise: [citing cases] . . . ."

In *Commonwealth v. Caplan,* 411 Pa., supra, the Court said (pages 567-569) : "Mandamus lies to compel a ministerial act [or mandatory duty] but not to review discretion, except where it is arbitrarily or fraudulently exercised or where it is based upon a mistaken view of the law: Garratt v. Philadelphia, 387 Pa. 442, 448, 127 A. 2d 738; Travis v. Teter, 370 Pa. 326, 330, 87 A. 2d 177; Maxwell v. Farrell School District Board of Directors, 381 Pa. 561, 566, 112 A. 2d 192.

"The procedure utilized to bring this case before our Court was inappropriate and therefore the writ of mandamus must be denied. . . . The Commonwealth should have petitioned this Court for a writ of prohibition.

."The law is now well settled that the Commonwealth may petition this Court to restrain a lower Court from granting discovery in a criminal case. While the cases are not in accord as to the extent or limitations of a writ of prohibition,* this Court under our King's Bench power has general supervisory and plenary power over all inferior tribunals: DiJoseph Petition, 394 Pa., supra [394 Pa. 19, 145 A. 2d 187]; Bell Appeal, 396 Pa. 592, 598, 152 A. 2d 731; Carpentertown Coal & Coke Co. v. Laird, 360 Pa. 94, 99, 100-101, 61 A. 2d 426; Bk. Comm. Vol. 3, *42. Cf. also Smith v. Gallagher, 408 Pa. 551, 185 A. 2d 135.

. . .

"For reasons above stated, the petition for a writ of mandamus is denied. However, because of the important issues presented in this case, we are staying all proceedings for 60 days in order to permit the District Attorney to petition this Court for a writ of prohibition."**

Sovereign Immunity of Foreign Nations

It is a long and well established general rule that *foreign Sovereigns, which are duly recognized by appropriate action by the State Department,* and their property *are not amenable* without their waiver or consent, *to suit* in the Courts of this Country. This widely accepted National and International diplomatic poli-

---

* "To avoid further confusion we expressly overrule Commonwealth v. Mellon National Bank & Trust Co., 360 Pa. 103, 61 A. 2d 430."

** See the following cases where the writ of prohibition was issued: *Special Grand Jury Case,* 397 Pa. 254, 154 A. 2d 592 (1959); *Philadelphia County Grand Jury Investigation Case,* 347 Pa. 316, 32 A. 2d 199 (1943); *Park's Petition,* 329 Pa. 60, 196 A. 495 (1938); *McNair's Petition,* 324 Pa. 48, 187 A. 498 (1936); *First Congressional District Election,* 295 Pa. 1, 144 A. 735 (1928).

cy has been established among many civilized non-communist Nations on the principle of comity and for the preservation of International friendships and Peace. In order to preserve this policy of Sovereign Immunity from conflict, confusion and erosion, and to prevent a breach of friendly relations or a severance of diplomatic relations or a possible war with a foreign nation, *the Supreme Court of the United States* has held that in the realm of Foreign Relations or Foreign Affairs, *a determination of Sovereign Immunity by the Executive branch of our Government,* namely, the State Department, when conveyed to a Court through proper channels or officials, is—in the absence of waiver or consent—*binding and conclusive* upon all our Courts. If and when the State Department concludes that a foreign Nation is entitled to Sovereign Immunity that determination, we repeat, is conclusive no matter how unwise or, in a particular case how unfair or unjust the Department's determination appears to be (a) to injured American citizens and (b) to vast numbers of the American people and (c) to our Courts: *Ex Parte Peru,* 318 U.S., supra; *National City Bank v. Republic of China,* 348 U.S., supra. See also to the same effect, *Guaranty Trust Company v. U.S.,* 304 U.S., supra; *Mexico v. Hoffman,* 324 U.S., supra; *The Schooner Exchange v. M'Faddon & Others,* 7 Cranch 116; *In re Investigation of World Arrangements, etc.,* 13 F.R.D. 280 (D.C., District of Columbia); *Government of France v. Isbrandtsen-Moller Co.,* 48 F. Supp. 631 (D.C. S.D.N.Y. 1943); *Sullivan v. State of Sao Paulo,* 122 F. 2d, supra. See also *Berizzi Bros. Co. v. S.S. Pesaro,* 271 U.S. 562; *Compania Espanola v. Navemar,* 303 U.S., supra; *Stone Eng. Co. v. Petroleos Mexicanos,* 352 Pa., supra. Cf. also *The Maret,* 145 F. 2d 431, 440 (C.C.A. 3).

*Ex Parte Peru,* 318 U.S., supra, is factually similar and legally controlling. That case involved the

libeling of the ship Ucayali belonging to the Republic of Peru to enforce a claim by a Cuban corporation arising out of the alleged breach (by a corporation acting for the Peruvian Government) of a charter party involving that ship. The case was commenced by *a writ of prohibition* filed in the Supreme Court of the United States after a lower Federal Court had refused to dismiss the libel, even after a Suggestion of Foreign Sovereign Immunity had been filed on behalf of the State Department. The Government of Peru asked for a dismissal of the action on the basis of a Suggestion of Immunity—filed (as in the case at bar) by the United States Attorney at the behest of the Attorney General, acting upon the request of the State Department which, in turn, was based upon a letter from the State Department's legal adviser*—which therein had "recognized" Peru's claim to Sovereign Immunity. The Supreme Court held (a) that the doctrine of Sovereign Immunity applied; (b) that Peru had not waived such immunity; (c) that upon submission of the State Department's certification that it recognized Peru's right to Sovereign Immunity *"it became the court's duty, in* conformity *to established principles, to release the vessel and to proceed no further in the cause."* (page 589). The Court pertinently said (pp. 579-580, 587-590) :

"This is a motion for leave to file in this Court the petition of the Republic of Peru *for a writ of prohibition* or of mandamus. The petition asks this Court to prohibit respondent, a judge of the District Court for the Eastern District of Louisiana, and the other judges and officers of that court, from further exercise of jurisdiction over a proceeding in rem, pending in that court against petitioner's steamship Ucayali, and to direct the district judge to enter an order in the proceeding declaring the vessel immune from suit. . . .

---

* This, we repeat, is the customary procedure.

"On March 30, 1942, Galban Lobo Co., S.A., a Cuban corporation, filed a libel in the district court against the Ucayali for its failure to carry a cargo of sugar from a Peruvian port to New York, as required by the terms of a charter party entered into by libelant with a Peruvian corporation acting as agent in behalf of the Peruvian Government. On April 9, 1942, the Republic of Peru, acting by the master of the vessel, intervened in the district court by filing a claim to the vessel, averring that the Republic of Peru was sole owner, and stating: 'The filing of this claim is not a general appearance and is without prejudice to or waiver of all defenses and objections which may be available to respondent and claimant, particularly, but not exclusively, sovereign immunity.'

"On the same day, petitioner procured the release of the vessel by filing a surety release bond in the sum of $60,000, on which petitioner was principal. . . .

. . .

"This case presents no question of the jurisdiction of the district court over the person of a defendant. Such jurisdiction must be acquired either by the service of process or by the defendant's appearance or participation in the litigation. Here the district court acquired jurisdiction in rem by the seizure and control of the vessel, and the libelant's claim against the vessel constituted a case or controversy which the court had authority to decide. Indeed, for the purpose of determining whether petitioner was entitled to the claimed immunity, the district court, in the absence of recognition of the immunity by the Department of State, had authority to decide for itself whether all the requisites for such immunity existed—whether the vessel when seized was petitioner's, and was of a character entitling it to the immunity. See Ex parte Muir, supra; The Pesaro, 255 U.S. 216; Berizzi Bros. Co. v. The Pesaro, 271 U.S. 562; Compania Espanola v. The Navemar, su-

pra. Therefore the question which we must decide is not whether there was jurisdiction in the district court, acquired by the appearance of petitioner, but whether the jurisdiction which the court had already acquired by seizure of the vessel should have been relinquished in conformity to an overriding principle of substantive law.

"That principle is that courts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarrass the executive arm of the Government in conducting foreign relations. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' United States v. Lee, 106 U.S. 196, 209. More specifically, the judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune. When such a seizure occurs the friendly foreign sovereign may present its claim of immunity by appearance in the suit and by way of defense to the libel. Compania Espanola v. The Navemar, supra, 74 and cases cited; Ex parte Muir, supra. But it may also present its claim to the Department of State, the political arm of the Government charged with the conduct of our foreign affairs. Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations. Compania Espanola v. The Navemar, supra, 74; The Exchange, 7 Cranch 116. This practice is founded upon the policy, recognized both by the Department of State and the courts, that our national interest will be better served in such cases if the wrongs

to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings.

"We cannot say that the Republic of Peru has waived its immunity. It has consistently declared its reliance on the immunity, both before the Department and in the district court. Neither method of asserting the immunity is incompatible with the other. . .

"The motion for leave to file is granted. We assume that, in view of this opinion, formal issuance of the writ will be unnecessary, . . ."

In *National City Bank v. Republic of China,* 348 U.S., supra, China sued the bank to collect a $200,000 deposit of the Shanghai-Nanking Railroad Administration which was an official agency of the Republic of China. The bank filed a counterclaim on the basis of China's notes upon which it had defaulted in the amount of $1,634,432. China then pled sovereign immunity as a defense to the counterclaim; this defense was disallowed because by bringing the suit China had waived the defense of sovereign immunity. Nevertheless, the Court speaking through Mr. Justice FRANKFURTER, said (pp. 358, 359) : *"The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court.* Accordingly, we start with the fact that the Republic *and its governmental agencies,* enjoy a foreign sovereign's immunities to the same extent as any other country duly recognized by the United States. See Guaranty Trust Co. v. United States, 304 U.S. 126, 137-138.

*"The freedom of a foreign sovereign from being haled into court as a defendant has impressive title-deeds.* Very early in our history this immunity was recognized, De Moitez v. The South Carolina, Bee 422, 17 Fed. Cas. 574, No. 9,697 (Admiralty Court of Pa., 1781, FRANCIS HOPKINSON, J.), *and it has since be-*

come part of the fabric of our law. It has become such solely through adjudications of this Court. Unlike the special position accorded our States as party defendants by the Eleventh Amendment, the privileged position of a foreign state is not an explicit command of the Constitution. It rests on considerations of policy given legal sanction by this Court. . . . It is idle to repeat or rehearse the different considerations set forth in Mr. Chief Justice MARSHALL'S classic opinion in The Schooner Exchange v. M'Faddon, 7 Cranch 116." ..

F. W. Stone Engineering Co. v. Petroleos Mexicanos, 352 Pa., supra, is likewise pertinent and controlling. That case was very similar to the case at bar: Plaintiff sued defendant, which was an instrumentality of the Mexican Government and wholly owned and controlled by that Government, in a foreign attachment proceedings and attached funds of the defendant which had been deposited and were in the possession of the Butler County National Bank & Trust Company. Defendant moved to dissolve the attachment and based its motion upon a communication from the Secretary of State to the Attorney General of the United States which recognized defendant as an instrumentality of Mexico. The letter from the State Department pertinently said: "Consequently, this Government recognizes and allows the claim of the Government of Mexico that Petroleos Mexicanos is immune from suit and its property from attachment." The United States Attorney (acting upon the direction of the Attorney General pursuant to the request from the Department of State) filed a "suggestion of Immunity." Although the defendant was admittedly an instrumentality of Mexico and was engaged in a commercial enterprise for profit, this Court affirmed the Order of the lower Court which dissolved the attachment and said (pp. 16, 17, 18):

"When the Department of State makes known its determination with respect to political matters growing

out of or incidental to our Government's relations with a friendly foreign state, *it is the duty of the courts to abide by the status so indicated or created* and to refrain from making independent inquiries into the merit of the State Department's determination or from taking any steps that might prove embarrassing to the Government in the handling of its foreign relations. See Republic of Mexico v. Hoffman, 324 U.S. 30; Ex Parte Republic of Peru, 318 U.S. 578, 588-589; The Maret, 145 F. 2d 431, 440 (C.C.A. 3) ; Sullivan v. State of Sao Paulo, 122 F. 2d 355, 357-358 (C.C.A. 2).

"What was said in Ex Parte Republic of Peru, supra, at p. 589, is both apposite and controlling here: 'The [State] Department has allowed the claim of immunity and caused its action to be certified to the . . . court through the appropriate channels. The certification and the request that the [property] be declared immune must be accepted by the courts as *a conclusive determination* by the political arm of the Government that the continued retention of the [property] interferes with the proper conduct of our foreign relations. *Upon the submission of this certification to the . . . court, it became the court's duty, in conformity to established principles, to release the [property] and to proceed no further in the cause'.* The learned judge of the court below faithfully observed that injunction."

See also *Guaranty Trust Co. v. U.S.,* 304 U.S., supra. In that case, the United States as assignee of the Czarist Government sued Guaranty Trust Company to recover a $5,000,000 deposit. The bank was allowed to defeat the claim by pleading the statute of limitations, since Sovereign Immunity is an affirmative right or defense which may be asserted or consented to or waived as the Sovereign desires. However, the Court pertinently said (page 134) : "It is true that upon the principle of comity foreign sovereigns and their public property are held *not to be amenable to suit in our*

*courts without their consent.* See The Exchange, 7 Cranch 116; Berizzi Bros. Co. v. S.S. Pesaro, 271 U.S. 562; Compania Espanola v. The Navemar, 303 U.S. 68. . . ."

As the District Court of the United States for the District of Columbia aptly said in *In re Investigation of World Arrangements, etc.,* supra (pp. 289, 291): "A foreign sovereign is immune to suit, without its consent, in the Courts of the United States. . . .

*"To cite a foreign sovereign into an American Court for any complaint against him in his public capacity is contrary to the law of nations. . . .* There is the same necessity for reciprocal rights of immunity, the same feelings of injured pride, *the same risk of belligerent action if government property is subsequently seized* or injured. . . ."

Chemical and Sulphur (plaintiffs below and appellees here) first contend that *The Schooner Exchange, Ex Parte Peru* and the *Stone* cases are restricted and limited in their effect and do not apply to the case at bar because (1) procedurally those cases arose out of a seizure (by libel or writ of foreign attachment) of property of a foreign Government or of its instrumentality and that through appellees' voluntary dissolution of the attachment without prejudice, this is no longer a "seizure" case and (2) consequently friendly foreign relations cannot be jeopardized by this suit. Appellees further contend that in spite of the release by them of the property seized, jurisdiction over the person of the defendant was obtained and still remains by way of the writ of foreign attachment, as well as by actual service of the writ and the complaint on the captain of Venezuela's ship. Appellees' attempted distinction of the Supreme Court cases previously cited in this opinion, and their aforesaid contentions are devoid of merit.

The principle or doctrine of absolute Sovereign Immunity has been attacked for many years by legal writers, by text authorities and by numerous Judges. The absolute doctrine is recognized by only a few countries in the world.* These authorities assert and appellees contend that even when Sovereign Immunity has been recognized and suggested by the State Department, the acceptance or rejection thereof is nevertheless a matter for the Courts—whether the action be in rem, or quasi in rem or in personam—and the Courts in their sole discretion may accept or reject the plea of Sovereign Immunity. They further assert that this principle of absolute Sovereign Immunity should be restricted and should apply only to situations and activities in which the foreign Country is acting or is involved in its national or governmental or public capacity and not in a proprietary or a commercial or private or nongovernmental activity or capacity. However, where the State Department has (through appropriate channels) recognized the Sovereign Immunity of the foreign Country which is involved, and that Country has not waived its immunity or consented to the suit, the Supreme Court of the United States has never recognized this proposed *restricted* doctrine.

### The Tate Letter

More importantly, appellees rely principally upon the so-called Tate Letter, which they contend (1) is the controlling law, (2) adopts the *restrictive* (foreign) Sovereign Immunity doctrine, and (3) allows American Courts *in every case* to accept or reject a Suggestion (or plea) of Sovereign Immunity by a foreign government (a) acting through the State Department and its

---

* A compilation of the position of many foreign nations on the subject of absolute or restricted Sovereign Immunity is set forth in the so-called Tate letter which is hereinafter discussed.

appropriate channels or (b) itself raising the issue. We shall quote the relevant parts of the Tate Letter, including the sentences which have caused confusion.

"UNITED STATES DEPARTMENT OF STATE—THE 'TATE LETTER' of May 19, 1952*

"Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments.

"My Dear Mr. Attorney General:

"The Department of State has for some time had under consideration the question whether the practice of the Government in granting immunity from suit to foreign governments made parties defendant in the courts of the United States without their consent should not be changed. The Department has now reached the conclusion that such immunity should no longer be granted in certain types of cases. In view of the obvious interest of your Department in this matter I should like to point out briefly some of the facts which influenced the Department's decision.

"A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, *a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign.* According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*). . . ..

"*The classical or virtually absolute* theory of sovereign immunity has generally been followed by the

---

* (1960 A.M.C. 898-901 Dept. of State Bulletin, volume 26, page 984.)

courts of the United States, the British Commonwealth, Czechoslovakia, Estonia, and probably Poland.* . . .

". . . The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the *restrictive theory* of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

"It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations.

"In order that your Department, which is charged with representing the interests of the Government before the courts, may be adequately informed *it will be*

---

* Tate then enumerates and discusses the many Countries which have abandoned the absolute and adopted the restricted principle.

*the Department's practice to advise you of all requests by foreign governments for the grant of immunity from suit and of the Department's action thereon.*

"Sincerely yours,

"For the Secretary of State:

"Jack B. Tate,

"Acting Legal Adviser."

(1) Does the Tate letter *unqualifiedly* express a new and restrictive policy, practice, and position of the State Department, viz., the Department will no longer recognize the absolute Sovereign Immunity of a foreign Nation, but merely *a restrictive* Sovereign Immunity; and (2) can the State Department privately change or abandon its policy in its sole discretion in each particular case; and (3) is the final determination a matter for the Courts or for the Department?*

Although the language of the Tate letter appears to be clear, its exact meaning has caused some confusion. The Tate letter, we repeat, states "For these reasons [the widespread practice on the part of governments of engaging in commercial activities] it will *hereafter* be the Department's policy to follow the *restrictive theory* of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

---

* It should be noted that in all cases in which the State Department has not advised a Court of its determination of Sovereign Immunity, the determination thereof is properly a matter for the Court in the light of all the facts in that particular case: *Republic of Mexico v. Hoffman*, 324 U.S. 30; *Berizzi Bros. v. S.S. Pesaro*, 271 U.S. 562; *Sullivan v. State of Sao Paulo*, 122 F. 2d 355 (C.C.A. 2) ; *Compania Espanola v. Navemar*, 303 U.S. 68; *Flota Maritima Browning De Cuba, Sociadad Anonima, v. Motor Vessel Ciudad de la Habana*, 335 F. 2d 619 (C.C.A. 4, 1964) and *Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F. 2d 354 (C.C.A. 2, 1964) ; *New York and Cuba M.S.S. Co. v. Republic of Korea*, 132 F. Supp. 684 (S.D. N.Y. 1955).

"It is realized that *a shift in policy* by the executive *cannot control* the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so."

The above quoted excerpts state in clear and unmistakable language that the Department has abandoned its long established principle of *absolute* governmental immunity and has *for the hereafter* adopted a new and restricted (restrictive) theory or principle of Sovereign Immunity, viz., absolute immunity does not apply to Governments when they are engaged in commercial activities. Furthermore, the Tate letter certainly implies —if indeed it does not clearly state—that the Department's conclusion and suggestion of sovereign immunity "cannot control" the Courts which are free to make their own determination. This would undoubtedly very substantially change, if not nullify, the prior well settled law of this Country on the subject of Sovereign Immunity. Irrespective of its clear meaning, it appears that the State Department has silently abandoned the "revised and restricted policy" set forth in the Tate letter and has substituted a case by case foreign Sovereign Immunity policy, i.e., the State Department will recognize and suggest, or fail to recognize or grant or suggest Sovereign Immunity *in each case* presented to it, depending (a) upon the foreign and diplomatic relations which our Country has at that particular time with the other Country, and (2) the best interests of our Country at that particular time.

In *Rich v. Naviera Vacuba, S.A.,* 295 F. 2d 24, 25-26 (C.C.A. 4, 1961), a Cuban ship had been libeled by an American corporation. In spite of Cuba's hostile attitude and belligerent actions toward our Country, and the fact that the ship was engaged in a commercial enterprise, a Suggestion of Immunity was filed by the United States Attorney General at the request of our State Department. The Circuit Court (for the 4th

District) sustained the Suggestion of Immunity and dismissed the libel. The Court rejected all the arguments therein made, which were repeated by appellees in this case, and said (pp. 25, 26) : "The vessel Bahia de Nipe sailed on August 8, 1961, from Cuba with a cargo of 5,000 bags of sugar destined for a Russian port. . . .

"The libellants argue that before sovereign immunity may be granted they should be heard by the court on whether the foreign government is in fact the owner and possessor of the property in question and, as to the ship, whether she was operated by that government not commercially but in a public capacity.

"Despite these contentions, *we conclude that* the certificate and *grant of immunity issued by the Department of State should be accepted by the court without further inquiry.* Ex parte Republic of Peru, 318 U.S. 578, 63 S. Ct. 793, 87 L. Ed. 1014. See also Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S. Ct. 530, 89 L. Ed. 729; Compania Espanola De Navegacion Maritima, S.A. v. Navemar, 303 U.S. 68, 58 S. Ct. 432, 82 L. Ed. 667. We think that the doctrine of the separation of powers under our Constitution requires us to assume that all pertinent considerations have been taken into account by the Secretary of State in reaching his conclusion."

Two individual claimants in the *Rich* case on September 9, 1961, petitioned the Supreme Court of the United States for a stay, on the ground that ". . . the suggestion óf immunity had been issued in violation of the State Department's policy as set forth in the Tate letter." In response and in opposition to that application, the Solicitor General filed a Memorandum for the United States and said : " 'Similarly, the applicants' reliance on the so-called "Tate letter"—dealing with the State Department's policy towards foreign government-owned vessels operated in commercial or mercantile

pursuits—is misplaced. That letter does set forth the considerations which the Department will take into account in determining whether or not to recognize a claim of immunity by a foreign sovereign. *But it is wholly and solely a guide to the State Department's own policy, not the declaration of a rule of law or even of an unalterable policy position;* and, in addition, it sets forth only some of the governing considerations and does not purport to be all-inclusive or exclusive. Here, the State Department has, in fact, recognized Cuba's claim to immunity, after taking into account all pertinent factors . . .' . . . ."*

On September 11, *1961,* Chief Justice WARREN denied the application for a stay: "Application for stay denied. See Ex Parte Peru, 318 U.S. 578, and the Republic of Mexico v. Hoffman, 324 U.S. 30."

It would appear from the Solicitor General's aforesaid memorandum or brief and the aforesaid Order of Chief Justice WARREN, that *Ex Parte Peru* and *Republic of Mexico* are still the law and that Sovereign Immunity when properly presented and not waived, is a matter for the *conclusive* determination of the State Department and not a matter for the Courts.

It is our conclusion, therefore, (1) that Sovereign Immunity of foreign Governments is a matter for determination in the first instance by the Executive Branch of the Government, namely, the State Department; and (2) if and when that Department's determination has been made and has been appropriately presented to the Courts, the Department's determination is binding and conclusive upon the Courts.

### Appellees' Other Contentions

We have examined (1) the Foreign Assistance Act

---

* 1 International Legal Materials—Current Documents 1962-1963, pages 277, 288-89.

of October 7, 1964,* and (2) the proposed official Draft of the Restatement of Foreign Relations Law, and (3) all the other authorities cited or quoted by appellees,** as well as (4) many other authorities researched by us. We have considered all the contentions made by appellees and all the aforesaid authorities, and believe that this case does not fall within any exceptions to the general rule.

We believe that the decisions of the Supreme Court of the United States and of this Court which are hereinabove quoted or cited control this case, and require this Court to grant the writ of prohibition prayed for by Venezuela.

Appeal of Venezuela quashed. A writ of prohibition is issued, directed to the Judges of the lower Court dissolving plaintiffs' attachment and dismissing plaintiffs' complaint.

------

CONCURRING OPINION BY MR. JUSTICE JONES:

I join in the result reached in the majority opinion.

The so-called "Tate Letter" of May 19, 1952, indicating a change of policy of the Department of State concerning the grant of sovereign immunity to foreign goverments, simply stated that *thereafter,* when the Department of State was considering requests of foreign governments for a grant of sovereign immunity, a more restrictive policy would be followed. We must assume that the Department of State is still pursuing that restrictive theory; there is nothing to the contrary indicated.

------

* P. L. 88-633, §620(e)(2), 22 U.S.C.A. §2370(e).

** Including one decision which constitutes the sole case in which a Court has recognized an exception to the general rule where Sovereign Immunity had been determined by the State Department: Katingo Hadjipatera, 40 F. Supp. 546 (D.C. S.D. N.Y.); affirmed 119 F. 2d 1022 (C.C.A. 2).

In the case at bar, the Department of State, after considering the request of Venezuela for the grant of sovereign immunity in this litigation, has taken the position that Venezuela's request should be honored and granted. The Department of State, through the appropriate channels, intervened in the court below and made known to that court that the Department of State recognized the validity of Venezuela's request for sovereign immunity in this litigation. Under such circumstances, the decisional law of the United States Supreme Court[1] requires that the court below should have granted recognition to and should have allowed the request of Venezuela for a grant of sovereign immunity. On such ground alone this matter should be determined.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I am in agreement with the majority that the appeal should be quashed and concur in that conclusion. I reach this result, however, as I shall indicate, for reasons vastly different than those of the majority.

Moreover, I dissent from the issuance of the writ of prohibition as well as from the majority's direction to the court below to dismiss plaintiff's complaint. I regard such action, at this stage of the proceedings and upon this record, as premature and unwise.

I dissent, too, from the majority's instruction to the court below to dissolve plaintiff's writ of attachment. In my view, such an order is entirely unnecessary. As the majority recites and the record clearly establishes, on October 24, 1963, the attachment was dissolved by direction of plaintiff. I, therefore, fail to find any legal basis or need for today's order to dissolve an attach-

---

[1] These decisions are to be found in the majority opinion.

ment which has been dissolved and nonexistent for more than two years.

The record discloses that plaintiff (appellee) commenced an action of assumpsit against defendant (appellant) by writ of foreign attachment in a court of common pleas of Philadelphia County. On the same day, plaintiff filed a complaint alleging the illegal expropriation by appellant of certain mineral rights owned by plaintiff and a breach of contract relating to the development and exploitation of those rights. Damages in excess of $116,000,000 were claimed.

By virtue of the writ of attachment, the Sheriff of Philadelphia County seized the S.S. Ciudad De Valencia, a merchant ship registered in the name of a foreign corporation wholly owned by defendant, and served both the master and the Stockard Shipping and Terminal Corporation as garnishees.[1]

Subsequently, some discussion between the parties having ensued, the attachment of the S.S. Ciudad De Valencia was dissolved "without prejudice" by direction of counsel for plaintiff. Thereupon, defendant, appearing through the Ambassador of the Republic of Venezuela, filed preliminary objections raising, inter alia, sovereign immunity and challenging the jurisdiction of the court to entertain the suit. Before any proceedings on the preliminary objections, however, a Suggestion of Immunity was filed in the court by the United States Attorney for the Eastern District of Pennsylvania at the direction of the Attorney General of the United States. The Suggestion informed the court that the Secretary of State had "recognized and allowed" defendant's claim to immunity and included a prayer that the action be dismissed.

---

[1] Plaintiff also served the master of the S.S. Ciudad De Valencia with the complaint and asserts that personal jurisdiction over defendant was thereby obtained. Defendant contests this assertion.

Thereupon, although the record does not indicate the manner by which the matter came before the court, argument as to defendant's claim to immunity and the effect to be given to the Suggestion of Immunity was heard by the court below.[2] Defendant concedes that it was *not* the moving party in this proceeding, denominating it as one instituted by the United States Government.[3] At this hearing, representatives of the United States Government, which had not intervened and which was not a party to the action, appeared to urge that deference be accorded the Suggestion of Immunity and that the suit be dismissed. And it was in response to a motion, not by one of the parties to the suit, but by the United States Attorney that the court entered the order presently being appealed.[4] Moreover, the court below did not treat these proceedings as though

---

[2] Argument was originally heard by Judge MILNER, President Judge of the Court of Common Pleas No. 3 of Philadelphia County. However, prior to the entry of his order, a petition for reargument before the court en banc was filed by appellee, which petition was granted, and the matter reargued before Judge MILNER and Judge ULLMAN.

[3] See Defendant's Petition for Writ of Mandamus or Prohibition, or both, para. 16.

[4] Although the court below denominated its order as though in response to a motion by defendant, such characterization is inaccurate. "There had been no 'motion of defendant to dismiss'; the argument had been solely 'in re Suggestion of Immunity' which was filed by the United States Attorney." Ibid. The order entered denied the motion to dismiss on the ground, as stated in the opinion subsequently filed by the court, that "judicial abdication" to the Suggestion of Immunity was not required and that a ruling in favor of defendant's claim to immunity was premature on the record before the court. The order, therefore, was based upon the court's view that absolute deference to the executive branch on the matter of immunity was not required, that the so-called "restrictive theory" of immunity was the prevailing rule, and that the defendant had not yet established its right to immunity within the ambit of that theory.

on defendant's preliminary objections, which remain undisposed.[5]

Such being the case, the order of the court below was without regularity and lacked sufficient legal significance at this stage of the decisional process to be reviewable on appeal. The United States Government had no standing to move the court and its action in doing so and the court's response thereto in terms of this appeal were without decisional force or effect. Accordingly, in the eyes of the law, no interest of either of the parties to this suit has as yet been adversely ruled upon by the court below and the parties remain in precisely the same position that they were prior to this unusual proceeding. Therefore, since no action has occurred to date which is cognizable by this Court on appeal, defendant's attempt to secure our review was properly quashed.

With regard to defendant's petition for a writ of prohibition, my disagreement with the majority extends beyond a difference in approach but reaches to the result as well. For while I view the circumstances previously noted as militating equally against the issuance of the writ, the majority proceeds to provide the extraordinary relief which defendant has sought. I am at a loss to understand the majority's haste to act. To the date of the taking of defendant's appeal, all that has occurred was the refusal of the hearing court to grant the motion to dismiss of a nonparty to the litigation. No determination has yet been made on the

---

[5] "The only issue presented in argument . . . has been that of defendant's claim of immunity from suit. The validity and regularity of the attachment, and the significance and effect of its dissolution 'without prejudice,' have not been argued or determined." *Chemical Natural Resources, Inc. v. Republic of Venezuela*, 38 Pa. D. & C. 2d 47 (1965). See Respondent's Memorandum, Republic of Venezuela v. The Honorable Byron A. Milner and The Honorable David L. Ullman, p. 2.

regularly advanced claims of either plaintiff or defendant. Defendant's preliminary objections remain pending in the court below. The net effect of these circumstances leads me to conclude that at this juncture we are confronted with a preliminary question of jurisdiction upon which the court below has not yet passed. The issue is obviously not ripe for appellate review. The record fails to disclose the existence of any prejudice or harm to the litigants which would justify or suggest either the need for or the desirability of immediate and extraordinary intervention on the part of this Court. In the absence of such circumstances, I find no basis for the present intrusion upon the regular process of adjudication which the majority presently undertakes.

Aside from these considerations, a serious jurisdictional question is raised by plaintiff's ex parte dissolution of the attachment of the S.S. Ciudad De Valencia. Although defendant did not raise the matter of the dissolution of the attachment in its preliminary objections, it may and should be raised by this Court sua sponte. Sovereign immunity involves the exercise of restraint on the part of the court, in deference to the political arm of the government, with respect to jurisdiction which has once attached. If, because of some irregularity in the manner by which plaintiff has proceeded, neither defendant nor its property is properly before the court, then the question of sovereign immunity need not and should not be reached.

I see no justification for proceeding to a consideration of a question which, in my view, is not properly before us. The matter of defendant's claim to immunity should not be considered by this Court until the court below enters an order which is in legal effect adverse to and appealable by one of the parties. The issue which the majority prematurely reaches on the merits might well be obviated by a favorable ruling in

the court below on defendant's jurisdictional objections or a finding that the ex parte dissolution of the attachment by plaintiff deprived the court of jurisdiction. I am even more opposed to such premature action when such is done through the medium of prohibition.

Appellant, in order to avoid the thrust of these arguments, urges that extraordinary intervention is required to prevent delay in the disposition of what it characterizes as "a public question of overriding importance." It contends that the delay attendant to the determination of its preliminary objections in the regular course of the proceedings is potentially injurious to the relations between our governments. It also seeks to concede that the dissolution of the attachment in no way affected any jurisdiction which may have been initially acquired thereby.

I am not convinced that defendant's arguments should carry the day. Defendant's view as to the effect of plaintiff's dissolution of the attachment is not dispositive. Foreign attachment is a matter governed by statute and the Rules of Civil Procedure. See Act of June 13, 1836, P. L. 568, §43, 12 P.S. §2861 et seq.; Pa. R. C. P. 1251-79. The parties may well not be empowered to depart from these provisions.

Plaintiff, in urging that jurisdiction was not lost by reason of its dissolution of the attachment, asserts that its action was pursuant to an understanding of the parties that the ship would be viewed as though remaining within the control of the attachment process and cites a number of cases in support of the proposition that such an agreement will suffice to support jurisdiction.[6] However, the cases upon which plaintiff relies are not dispositive in that they arise under fed-

---

[6] *Continental Grain Co. v. Barge FBL*, 268 F. 2d 240 (5th Cir. 1959), aff'd 364 U.S. 19, 80 S. Ct. 1470 (1960); *Reed v. Steamship Yaka*, 307 F. 2d 203 (3d. Cir. 1962).

eral admiralty practice, not under our attachment procedure. Moreover, all appear to involve written stipulations between the parties that any final judgment would be respected by the "claimant." The effect of such stipulations is the creation of a contractual undertaking in lieu of bond. In the instant case, there is nothing of record to disclose any such undertaking between the parties. Therefore, a question is presented as to whether the court below retained a sufficient nexus with defendant or its property to ground jurisdiction. A determination as to the understanding of the parties, if such was the case, and its legal effect would appear required before this Court proceeds to hold that jurisdiction was not affected by the dissolution. I venture no view on the merits but believe the matter to be one requiring a determination by the court below in the first instance.

Any possible contention which might arise by reason of the restraint of defendant's property has been obviated by plaintiff's dissolution, *without bond,* of the S.S. Ciudad De Valencia. Defendant is as free to pursue its engagements, and has been so free for over two years, as it was prior to the commencement of this litigation. No affront should arise merely because defendant is required to seek relief in accordance with the demands of an orderly judicial system. In light of these considerations, the circumstances do not warrant the intrusion the majority makes today.

In my view, the only appropriate disposition is to remand the matter to the court below so that it may pass upon the effect of the dissolution of the attachment and, if necessary, defendant's preliminary objections.

Finally, were the case appropriate for treatment on the merits of the sovereign immunity issue, I would be in agreement with the majority that federal decisional law requires that we deem the Suggestion of Immunity

in the instant case as conclusive. See *Mexico v. Hoffman*, 324 U.S. 30, 65 S. Ct. 530 (1945) ; *Ex Parte Peru,* 318 U.S. 578, 63 S. Ct. 793 (1943) ; *Rich v. Naviera Vacuba, S.A.,* 295 F. 2d 24 (4th Cir. 1961).

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO :

Brief Statement on Scope of Dissenting Opinion

Involved in this case is an expropriation of the property of American citizens by the Venezuelan government not only without fair compensation as required by International Law but with an accompanying arrogant refusal to even enter into any settlement negotiations. Moreover, the role of our State Department is most puzzling and inconsistent with its own expressed policy.

The plaintiff began its lawsuit after the State Department tried unsuccessfully to bring the Venezuelan Government to a conference discussion. After the action was filed, the State Department scheduled a hearing and received briefs to determine whether—*as a matter of law, not policy*—the Venezuelan Government was immune from suit under the Sovereign Immunity doctrine. The legal advisor of the Secretary of State decided as a *legal* matter that the Sovereign Immunity doctrine should be invoked and filed such a plea in behalf of the Venezuelan Government. In so doing the State Department obviously invaded the jurisdiction of the Courts and for that reason alone the judiciary must approach the problem as if the State Department had not intervened at all.

Moreover, even if the State Department had decided to intervene because of some urgent policy considerations and not on the basis of the legal issues, the case is nevertheless subject to a judicial examination which

quite conclusively demonstrates that the circumstances in this case do not warrant invocation of the Sovereign Immunity doctrine. At the outset we are instructed by the Supreme Court of the United States in the *Republic of China* case that the doctrine is not one which emanates from the Executive Department. On the contrary, the Court emphasized that it was judicially created, and, as such, is subject to judicial modification or even elimination, as changing times and circumstances require.

Indeed, even before the official proclamation of the Department of State in the form of the Tate Bulletin there had been a gradual erosion of the doctrine so that courts were loathe to invoke the doctrine except under the most compelling circumstances. The Tate Proclamation was by its own terms expressly intended to change the policy and leave the determination of the applicability of the policy to the courts. It specifically declared that the Department's policy, thenceforth, would be "to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity."

The Tate proclamation was rendered in 1952 and, therefore follows, in date, the decisions relied on by the Majority. The *Republic of China* case, the last expression of the Supreme Court on the subject, recognizes and points up this fact, giving express approval to the restrictive theory and the recognition of it in the Tate proclamation. The Supreme Court's decision makes it quite clear, therefore, that the present policy of the United States Government is to follow the restrictive theory of sovereign immunity, and that the doctrine of absolute sovereign immunity should not be invoked except under the most compelling circumstances, as where national security is involved. Such is not remotely involved here.

## History of Case

Chemical Natural Resources, Inc.,[1] a Delaware corporation, with almost 100% of its capital stock held by American nationals, purchased in the early part of April, 1952, all the mineral rights in El Pilar, District of Benetez, Sucre, Venezuela. While conducting drilling operations in that location, the plaintiff located reservoirs of mineral-laden geothermal steam and other minerals of great pecuniary value. In the latter part of April of that year the plaintiff entered into an agreement with the Venezuelan agency known as CADAFE, whereby it would install an electricity generating system and sell power to the Venezuelan Government. To accomplish the erection of the necessary power plants the plaintiff obligated itself to the extent of $25,000,000 for the purchase of equipment.

Suddenly, on August 29, 1959, the Venezuelan Government, without notice, and certainly without legal or moral justification of any kind, declared the plaintiff's holdings nationalized and expropriated its property without compensation. Later the Venezuelan Government approached the plaintiff and sotto voce explained that it should have no reason to fear for its investments nor for the result of its labors because the expropriation was merely a dramatic gesture made for political reasons. Venezuela urged the plaintiff to continue to invest its skills, efforts and money.

Then, on September 7, 1959, the Venezuelan Government "cancelled" its agreement with the plaintiff but once more elaborately whispered into the plaintiff's ear that political conditions being what they were, the Venezuelan Government had to assume an "anti-gringo" attitude, but that this was only a mask. Be-

---

[1] The Venezuelan Sulphur Corporation, listed in this case as a co-plaintiff, is owned by Chemical Natural Resources, so that all references to the plaintiffs will be in the singular number.

hind the mask, Venezuela said, it was wholly friendly to the plaintiff, appreciated its interest in the development of the country and exhorted it to continue its operation.

Because of the many difficulties and harassments to which the plaintiff was constantly being subjected, in spite of Venezuela's continuing assurances, it finally entered into a new contract with Venezuela which pro-vided that for twenty-five years the plaintiff and Venezuela would equally divide profits on the operation and then, after amortization of the expenses involved, the property of the plaintiff would belong to Venezuela. Even with this lion's share being assured it, Venezuela still was not satisfied and, in September, 1962, demonstrated that the anti-gringo mask, behind which it had spoken, was not a mask but its actual face. Venezuela abrogated all its contractual obligations and ordered the plaintiff to complete the erection of its plant, produce energy and sell it to Venezuela at a ruinous loss per kilowatt hour. This was confiscation—bare and unadorned. It defied international law and subjected the plaintiff to losses aggregating $116,807,258.88. The plaintiff turned to the United States government for protection and asked the Secretary of State to intercede in its behalf. The Venezuelan Government, however, refused to enter into any discussion whatsoever on the subject. The plaintiff thus was compelled to file an action in the court of common pleas for damages caused by breach of contract and illegal expropriation of private property without compensation. The plaintiff effected service by foreign attachment of one of the defendant's commercial vessels in the harbor of Philadelphia.

With an effrontery as bold as its order of confiscation, the Republic of Venezuela now asked the government of the United States to plead Sovereign Immunity in its behalf. The State Department asked the plain-

tiff to dissolve its foreign attachment. The plaintiff did so with the understanding that Venezuela would then enter into amicable negotiations looking toward settlement of the claim, but if no settlement was effected, the suit against Venezuela would duly proceed. Venezuela refused to take a step toward the round table of conciliation and, instead, with ever-increasing brazenry, insisted on sovereign immunity from its indebtedness to the plaintiff. The Legal Adviser of the State Department conducted a hearing in the matter and eventually ruled, that, as a *matter of law* and not of policy, the Venezuelan Government was entitled to sovereign immunity and such a plea in the name of the State Department was filed in the court of common pleas on December 18, 1964. The court overruled the Suggestion of Immunity and refused to dismiss the complaint. The defendant appealed to this Court. In addition, the plaintiff filed here a petition for writ of mandamus and a writ of prohibition, naming as respondents the two judges in the lower court which had overruled the Suggestion of Foreign Immunity. The Majority of this Court quashed the appeal but ordered the issuance of the writ of prohibition directed to the judges of the lower court to dissolve the foreign attachment and the complaint.

## Executive Department not Supreme

Surveying and appraising what has been done by Venezuela here, it would be difficult to conjure up a more flagrant violation of the property rights of American citizens who are being urged, in the interest of the Good Neighbor Policy, to invest in Latin America. The Majority Opinion says that no matter how unjust or unfair Venezuela has been to American citizens, to the American people, or even to our judicial system, this Court is powerless to protect Americans once the State Department hints Foreign Sovereign Immunity.

I believe that the Majority, in asserting such helplessness, not only does a great injustice to the plaintiff in this case but it works, in addition, an incalculable harm to the fundamental concept of our American form of government, namely, that each of its three departments acts independently of the other two and none is presumed to be infallible in the discharge of its prescribed duties.

The Majority is of the opinion that once the Executive Department of our government speaks, the Judiciary Department may not question what the Executive Department has said or even inquire into the circumstances which brought about the Executive Department's utterance. Nothing in the Constitution, no expression in statutory law, no precedent in court decisions, and, needless to say, nothing in the chronicles of deliberation of our founding fathers, does or can justify so startling a proposition. The decision of this Court is even more astonishing because the very Department which this Court declares infallible has denied infallibility and has specifically announced, as a matter of official policy, that foreign sovereign immunity in commercial transactions is something not to be decided unilaterally by the State Department, but is a matter for adjudication in the Courts.

On May 19, 1952, the State Department proclaimed what is officially known as 26 Department of State Bulletin 924, although it is often loosely referred to as the "Tate Letter." The "Tate Letter" was no mere epistle advancing the views of an inconsequential correspondent. It was an official pronouncement of the State Department which had the effect of law. *Columbia Broadcasting System v. United States,* 316 U.S. 407, 417; *A. T. and T. Co. v. United States,* 299 U.S. 232.

That proclamation, which is admittedly still the present policy of the State Department, specifically declares: "The granting of sovereign immunity to foreign

governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels *the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts.*" (Emphasis supplied.)

In 1952, the United States Supreme Court in the *Republic of China* case, 348 U.S. 356, juridically acknowledged this pronouncement of the State Department: "Recently the State Department has pronounced broadly against recognizing sovereign immunity for the *commercial operations* of a foreign government, 26 Dept. State Bull. 984." (Emphasis supplied.) (p. 361)

The Majority Opinion in the case at bar quotes from that *Republic of China* case as follows: "The *status* of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court. Accordingly, we start with the fact that the Republic and its governmental agencies enjoy a foreign sovereign's immunities *to the same extent* as any other country duly recognized by the United States." (Emphasis supplied.)

No one questions that the United States has recognized the Republic of China and that it enjoys sovereign immunity "to the same extent as any other country duly recognized by the United States." Nor does anyone dispute another quotation from that case by the Majority Opinion, namely, "The freedom of a foreign sovereign from being haled into court as a defendant has impressive title-deeds . . . it has since become part of the fabric of our law."

· . The Majority Opinion underscores the above quotation but it does not underscore what immediately follows, namely, "It has become such solely through adjudications of this Court." I would add to that expression an exclamation point, and repeat that, to the extent that sovereign immunity exists, it is a creature of the Courts, not the Executive Department of our government. And what the Courts have created, they can take away.

The Majority Opinion cites no case and quotes from no decision of the Supreme Court of the United States which strips that Court of its power to determine whether sovereign immunity has been properly invoked. The *Republic of China* case, in fact, rules absolutely to the contrary. In rejecting the claim of sovereign immunity presented by the Republic of China in that case, Justice FRANKFURTER, speaking for the Court, said: "It is recognized that a counterclaim based on the subject matter of a sovereign's suit is allowed to cut into the doctrine of immunity. *This is proof positive that the doctrine is not absolute, and that considerations of fair play must be taken into account in its application.*" (Emphasis supplied.) (p. 364)

What the Majority overlooks in this, its present decision, is that sovereign immunity is not a constitutional mandate. The Supreme Court spelled this out in the *China* case: "Unlike the special position accorded our States as party defendants by the Eleventh Amendment, the privileged position of a foreign state *is not an explicit command of the Constitution. It rests on considerations of policy given legal sanction by this Court.* To be sure, the nonsuability of the United States without its consent is likewise derived from considerations of policy. But these are of a different order from those that give a foreign nation such immunity." (Emphasis supplied.) (pp. 358-59)

Of course, it is obvious and indisputable that where the nation's security is involved, the Courts will support the foreign policy of the nation, as it is officially made known by the President of the United States. But that is not this case. It is not even close. We have here outrightly a commercial transaction. We have here the case of American businessmen, under the most absolute assurance of safeguarding by Venezuela, going into Venezuela, investing huge sums of money to develop Venezuela's resources with the official sanction and urging of the Venezuelean government, and then that same government confiscating, without compensation, the property of these American businessmen, property amounting, as already stated, to over a hundred million dollars.

The Venezuelean government knew, when it invited American investors into its country, that its commercial relations with American citizens would be governed by the restrictive immunity doctrine proclaimed by the State Department. It knew also, as the Supreme Court had declared, that sovereign immunity is not an absolute right, running concurrently with sovereignty, but is a limited defense which depends for its application upon the existence of "fair play" and the presence of due process. (348 U.S. 364). It further was aware that our courts make a distinction between governmental and proprietary activities of a foreign government defendant, and that sovereign immunity will be applicable only when a government acts as a government and not when it acts in a commercial, money-making enterprise.

### Majority's Erroneous Concept

The Majority Opinion in this case is built on an erroneous concept of the law, namely, that once the State Department whispers sovereign immunity the

Courts must close their doors to everyone who may come within the breeze of the zephyric suggestion. Fortunately, for the majesty of the law, the dignity of the courts, and the fair-minded administration of justice in America, that is not the case. In fact, that is not even the view of the State Department.[2]

The State Department intervened in this litigation on the basis of a question of law, not policy. In a letter to the President of the plaintiff corporation, Chemical Natural Resources, Inc., the State Department said: "The decision of the Department of State in this matter was made in the light of *legal issues.*" (Emphasis supplied.)

Thus, it must be obvious that we are not here considering any question of United States foreign policy. We are adjudicating legal issues and I certainly should not have to emphasize that legal issues are resolved by the judicial branch of our government, not the executive branch. As the Supreme Court of the United States declared in the *Republic of China* case: "The short of the matter is that we are not dealing with an attempt to bring a recognized foreign government into one of our courts as a defendant and subject it to the rule of law to which nongovernmental obligors must bow. We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice." (p. 361)

The *claims of justice* guarantees to the plaintiffs here a forum in which to prosecute their case against a foreign government, engaged in commercial enterprise, without in any way embarrassing our government. The court below in this case very properly said: "The position of the Legal Adviser to the State Depart-

2 Dept. of State Bulletin, Vol. 26, p. 984.

ment, the Attorney General, the United States Attorney, and the defendant, appears to be that immediately on the filing of the suggestion of immunity this court must automatically dismiss the action, thus closing the doors of the court to an American corporation, predominantly owned by American citizens, seeking redress against a foreign country alleged to have violated its solemn agreements and confiscated private property without compensation. We do not understand the law to require this judicial abdication."

Although the Majority Opinion would assign to the Executive Department of the government a constitutional infallibility which finds no justification in the law books, it refuses to recognize in the Legislative Department, another coordinate branch of the government, the authority which is conferred on it by the United States Constitution. In 1964, the United States Congress enacted a solemn law of far-reaching consequences. It was called the Foreign Assistance Act, 78 Stat. 1009, 22 U.S.C. sec. 2370, and it was passed because of events similar to the very one which is the subject of the present litigation, namely, the confiscation by foreign governments of American-owned property in violation of international law. The American Congress, in a piece of legislation comparable, in courageous utterance in the protection of American interests, to the Monroe Doctrine, declared: *"Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in viola-*

*tion of the principles of international law."* (Emphasis supplied.)[3]

If United States Senators and Congressmen were viewing this very case before us, they could not have worded their legislation more precisely, to have it apply to what has been done by the Venezuelean Government in the matter here for review. The government of Venezuela, at a date subsequent to January 1, 1959, confiscated American-owned property in violation of international law. All this is properly pleaded by the plaintiffs and must be accepted as fact.

The Majority Opinion gives but scant attention to this vital Act of Congress. It merely says that it has considered the Foreign Assistance Act of October 7, 1964. But has it given it *proper* consideration? The Act distinctly states that "Notwithstanding any other provision of law," and this, of course, would include all cases cited by the Majority, "no court in the United States SHALL DECLINE ON THE GROUND OF THE FEDERAL ACT OF STATE DOCTRINE TO MAKE A DETERMINATION ON THE MERITS GIVING EFFECT TO THE PRINCIPLES OF INTERNATIONAL LAW," etc. (Emphasis supplied.) But that is exactly what this Court is doing! It is declining to make a determination in a case where a right is being asserted by a "foreign state based upon a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law."

There was reason for the Congress of the United States to enact the above-cited legislation. It had seen how foreign government after foreign government, even when receiving aid from the United States,[4] seized

---

[3] No effect shall be given to acts of a foreign sovereign that are found to be in violation of international law. (Senate Report No. 1188, Cong. Record Vol. 110 (1964)).

[4] It might be appropriate to point out, as the lower court did in its opinion, that from 1956 through 1965 the United States has

American property without compensation, harassed American officials, interfered with legitimate transportation facilities of the United States and maltreated American citizens. Standing up to the neck in the flood of such affronts, insults and outrages, the American Congress finally struck back and said that any government which, in violation of international law, confiscated American-owned property, would not be allowed, in United States courts, to plead the sovereign immunity doctrine. That is the purpose, practically the language of the Foreign Assistance Act, which the Majority of this Court treats as if it had no more authority than a municipal ordinance.

### Majority Cites Cases which are not Controlling

Instead of accepting its responsibility and stoutheartedly recognizing the legal issue in this case, the Majority attempts to bolster an archaic doctrine with cases which have no resemblance to the fact situation before us. It says, for instance, that the decision in the case of *Ex Parte Peru,* 318 U.S. 578, is "controlling." It is not controlling. To begin with, the *Peru* case preceded the Tate Proclamation which announced the restricted sovereignty immunity rule, and, more importantly, it antedated the decision of the Supreme Court in the *Republic of China* case, which affirmed the restrictive sovereign doctrine. Moreover, the facts in *Peru* are wholly different from the facts in the case at bar. The Peruvian vessel "Ucayali" had been seized and was being detained at the time of the lawsuit. The ship in the instant case, the "Ciudad de Valencia," although originally attached, was released two days later and the proceedings here are in personam and not in rem. The plaintiff is not seeking execution on a judg-

---

granted aid to the Republic of Venezuela in an aggregate amount of upwards of $380,000,000.

ment, it is not holding property belonging to the defendant, it is not embarrassing foreign relations between Venezuela and the United States. It is merely seeking an adjudication in an American court of its legal rights. Even if it obtains judgment, the question as to whether the judgment can be collected is something to be decided later, but certainly it has the legal and constitutional prerogative to have its rights determined in a court of law.

In the *Peru* case the petitioner procured the release of the vessel by filing a surety release bond in the sum of $60,000. There has been no such bond filed in this case. The whole ratio decidendi in the *Peru* case is the seizure and *detention* of a vessel. And I repeat, there is no detention here, there is no embarrassment to the United States, no impediment to Venezuela in carrying on its commercial enterprises with and in the United States. There is only a business transaction in which American citizens are seeking to litigate their claims in an American court, because they have, quite effectually, been denied an impartial forum in Venezuela.

Another reason why *Peru* is not controlling is that the vessel which was there involved, the "Ucayali," was seized while the United States was at war. At the time of its arrest the vessel was "under engagement to transport materials for the United States Army."

The Majority Opinion says that the case of *F. W. Stone Engineering Co. v. Petroleos Mexicanos,* 352 Pa. 12 is "likewise pertinent and controlling," but since *Stone Engineering* is built on *Peru* and we have seen that *Peru* is no longer authority for the proposition urged by the defendant, a fortiori, *Stone Engineering* would not be authoritative in the case at bar. In addition, it is to be noted that in *Stone Engineering* our Court specifically stated that we accepted the Department of State's suggestion of immunity because it was a "determination with respect to political matters con-

cerning foreign relations." Exercising the most fertile imaginative creative faculty, it cannot be said that the litigation here involved, that is, the ascertainment of damages due to a breach of a business contract, constitutes a determination of *"political* matters concerning foreign relations."

The case of *Rich v. Naviera Vacuba, S.A.*, 295 F. 2d 24, also cited by the Majority Opinion, is also not controlling or relevant because there, again, there was a detained vessel and, in addition, the Suggestion of Immunity filed by the State Department specifically declared: "This is to inform you that it has been determined that the release of this vessel would avoid further disturbance to our international relations in the premises." No such precarious situation is presented or even hinted at in the case at bar, and it is particularly to be noted that in the *Rich v. Naviera* case the litigation was permitted to *go to judgment* in spite of the international relationship phase, the judgment entered in favor of the plaintiff amounting to $80,517.61. It was only when execution was attempted that the question of sovereign immunity arose. And I repeat that no execution or detention is involved in the instant case. The plaintiffs are seeking merely to have their case *adjudicated* as was done in *Rich v. Naviera.*

It is true, as the Majority's opinion points out, that in the *Rich v. Naviera* case the petition for certiorari was denied on the authority of the *Peru* case under the emergency circumstances which existed there, but I again call attention to the fact that the *Naviera* case had to do with execution on a judgment, an actual seizure of the vessel involved, whereas, in the case at bar, I repeat, we do not have the question of attachment, seizure or execution.

The distinction between immunity from jurisdiction and immunity from execution is elementary. In *Weilamann v. Chase Manhattan Bank*, 21 Misc. 2d 1086,

192 N.Y.S. 2d 469 (S. Ct. 1959), the Legal Adviser of the State Department said to the Attorney General: "the Department of State has heretofore recognized a distinction between 'immunity from jurisdiction' and 'immunity from execution'." Here, of course, we are concerned only with the question of "immunity from jurisdiction," and I repeat there is no law which immunizes Venezuela, in a purely commercial transaction, from the jurisdiction of American courts. Moreover, and this should not be overlooked, the *Naviera* case was decided before the enactment of the Foreign Assistance Act which specifically declares, again I repeat: "Notwithstanding any other provision of law, *no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits* giving effect to the principles of international law, etc." (Emphasis supplied.)

### The Sovereign Immunity Rule is a Relic of the Law, overdue for interment in a Legal Museum

The doctrine of sovereign immunity rose from the fiction that kings were divinely anointed and, therefore, could do no wrong. Not only was this sovereign infallibility recognized in the realm over which the king reigned but it extended into other kingdoms because all the kings were in mutual conspiracy to prevent anybody from attacking their infallibility and subject them to such mundane annoyances as responsibility for debt. Kings were regarded not only untouchable but immortal, and the cry of "The King is dead, long live the King" was often heard in the land.

Thus, when anyone dared to suggest in court that a king, living or dead, was to answer to a citizen of the realm, the judges snapped a snuffer over the candle of the law and smothered the flame of justice.

In time, monarchical government fell into desuetude and was succeeded by constitutional government but the fiction of sovereign immunity had carried on for so long and had always been approached with such reverential fear that even with the demise of its principal beneficiary, the aura of supreme authority still endured because one approaches even a dead lion with a certain sense of respect and awe.

Thus, republics and other forms of succeeding governments held on to the myth and the legend of monarchical prerogatives, and, although it was known that the immunity was a fraud and a sham, the cry was still heard: "Sovereign Immunity is dead, long live Sovereign Immunity!"

America, however, was not so mesmerized as the rest of the world with the idea of governmental sanctification, and, accordingly, as early as 1797, the United States Congress recognized the injustice of the doctrine and modified it to the extent that when the United States brought a civil action against an individual, the individual defendant was allowed to set off debts due him from the government. There still persisted the notion, however, that somehow the government itself could not be made the object of a lawsuit. The government was still sacrosanct, the government was still the holy of holies, it still could do no wrong, but what was the government but the people and, if anyone should respond to injustice done the people, it should be the people themselves who *are* the government.

Accordingly, in 1857 Congress boldly took the first step toward making government responsible for its debts by creating the Court of Claims. In 1877 Congress went further and gave concurrent jurisdiction to the United States courts to entertain claims against the government sounding in contract. Then, by a series of acts, notably the Federal Employees' Compensation Act of 1916 (39 Stat. 742, 5 U.S.C. §751 et seq.), the Unit-

ed States made itself liable to pay workmen's compensation to its employees. Acknowledgment of governmental responsibility was further expanded by the passage in 1920 of the Suits in Admiralty Act (41 Stat. 525, 46 U.S.C. §741 et seq.), followed in 1925 by a similar act applying even to actual ships of war. And then finally Congress almost wholly dismantled the wall surrounding sovereign irresponsibility by passage of the Federal Tort Claims Act of 1946, 60 Stat. 843, 28 U.S.C. §1346(b).

After thus opening the gates of justice to American claimants, our government decided to make itself liable to foreign claimants as well because one should not be less just outside his house than he is under his own roof. The United States embarked on the policy of not claiming immunity for its publicly-owned or publicly-operated merchant vessels. From all this, it must be quite obvious that the granting of sovereign immunity to foreign governments in the courts of the United States is wholly at variance with the policy of the United States in subjecting itself to suit in both contract and tort "and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels." (Dept. of State Bulletin, volume 26, page 984, May 19, 1952). Our Department of State declared further: "The Department feels the widespread and increasing practice on the part of *governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts.*" (Emphasis supplied.)

The Majority Opinion in this case does not answer the question which inevitably springs up: Why should this government allow to foreign governments a privilege which it does not enjoy itself? Why should Venezuela be permitted to come into our courts and claim an immunity from a contractual obligation when the

United States does not exercise that privilege in its relationship with its own citizens or with foreigners?

Of course, no one questions, and last of all myself, that where national security is involved, governments which are friendly to us should be accorded every consideration even though application of such a rule means rewarding former enemies and present ingrates. For instance, Germany, which has on two occasions during the last half century been a mortal enemy, is now (the Western part) an ally in the Cold War. Great Britain which in the colonial days was tyrannical and oppressive to Americans is now a staunch ally. France, ever dear to American hearts because of Lafayette, Rochambeau and the Statue of Liberty, is, through her erratic president General DeGaulle, consorting with Communist China, an outspoken nemesis of America, and intent on our destruction.[5] Japan, that stabbed America in the back at Pearl Harbor on the day "that will live in infamy," today extends the hand that had held the knife, to receive largess being poured out by the United States over all convexities of the globe.

Nations, like individuals, can be ungrateful, perfidious, treacherous and dishonest, and so we have

---

[5] On November 23, 1965, the Philadelphia Inquirer, in an editorial which has been reprinted in Europe, said: "History's pages, from ancient to modern times, are sprinkled with many instances in which a generous benefactor who helped a friend in dire trouble has subsequently been repaid only with scorn. But never before, in the annals of mankind, has the ingratitude been so enormous as in the case of Charles de Gaulle's massive contempt for the United States . . . Of all recipients of U.S. aid, France stands at the very top in total amount received—$8,834,000,000 in the period from July 1, 1945 to December 31, 1964. This sum, though astronomical, does not begin to tell the full story. It can be written only in the agony and blood of the thousands of Americans who have fought in France in two World Wars and have died in battle in order that the French might endure as a free people. Charles de Gaulle expresses his 'thanks' with a campaign of vicious abuse that knows no limits . . ."

Russia, which has been a gluttonous recipient of American assistance, now prodding the Viet Nam guerilla Communists to kill American soldiers. Although in World War II we rushed to the rescue of the Soviet Union, which might otherwise have been destroyed by its erstwhile Nazi ally, the Soviets have, ever since, waged a cold war of ingratitude against the United States which has piled on to the shoulders of its citizens a crushing sack of taxes such as has never been carried before. Even so, America stands ready to deal with this rudely ungrateful nation, if only we can join together in deeds of peace. And this applies also to France. Despite DeGaulle's debauchery of thanklessness, America still aids France, still maintains an army on her soil to save France from annihilation if Russia should ever decide to annihilate her.

But, with all this, the judiciary has nothing to do. The President of the United States speaks on foreign policy and his utterances become stare decisis for the American courts. But I cannot emphasize too strongly that there is nothing like this in the present case. The President has not said that Venezuela is entitled to sovereign immunity and it is only when the President speaks, that the Foreign Assistance Act is suspended in its operation in a case such as the one before us. That Act declares that it shall be inoperative "in any case with respect to which the President determines that application of the act of state doctrine is required *in that particular case* by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court." (Emphasis supplied.)

In this respect, the lower court, in the case at hand, well said: "In other words, this court could be precluded from entertaining a defense based on the act of state doctrine in this case only by a specific determination by the President that application of the doctrine

is required in this *particular* case by the foreign policy interests of the United States, and with a suggestion to that effect filed in this court on behalf of the President. This being the policy enacted by Congress with respect to the act of state doctrine, we are not disposed to dismiss this action merely on the basis of a rather perfunctory suggestion by the Legal Adviser to the State Department, phrased in general terms, that defendant is immune from suit in the first place." (Emphasis in original.)

And I believe that the lower court spoke wisely, as well as courageously, when it said: "Standing unexplained as it does in this record, the Legal Adviser's statement that the decision to issue the suggestion of immunity was made in the light of legal issues appears to us to be totally inconsistent with any contention that the department's action in recognizing and allowing the defense of sovereign immunity has anything to do with the implementation of foreign policy and the conduct of foreign relations. It appears to mean rather that the State Department, or one or more of its agencies, arrogates to itself the responsibility of holding a hearing, listening to oral arguments and considering written memoranda presented by counsel for both sides, and then made a determination of the 'legal issues' involved. This we regard as an exercise of the judicial, not the executive, function."

The "legal issues" determination by the State Department is not only non-sustaining in view of what we have here stated, but it is at odds with what was declared by the illustrious Secretary of State Cordell Hull in a Mexican case with facts similar to those in the Venezuela case. The Mexican Government attempted to take American-owned property without compensation. In a note to the Mexican Ambassador on August 22, 1938, Secretary of State Hull said: "Under every rule of law and equity, no government is entitled

to expropriate private property, for whatever purpose, without provision for prompt, adequate, and effective payment therefor. In addition, clauses appearing in the constitutions of almost all nations today, and in particular in the Constitutions of the American republics, embody the principle of just compensation. These, in themselves, are declaratory of the like principle in the law of nations.

"The universal acceptance of this rule of the law of nations, which, in truth, is merely a statement of common justice and fair-dealing, does not in the view of this Government admit of any divergence of opinion." (3 Hackworth, Digest of Int'l Law 658-9).

There is no reason why what has happened in the Venezuela case should admit of any divergence of opinion from what was stated by Secretary of State Hull in the Mexican case. Secretary Hull's positive declarations are embodied in the Restatement of Foreign Relations Law of the United States (Proposed Official Draft 1962) : "§190 . . . The taking by a state of property of an alien is wrongful under international law if . . . (b) it is not accompanied by payment of just compensation or, under the law and practice of the state in effect at the time of taking, there is not reasonable provision for the determination and payment of just compensation."

It is in point also to note that the principle just enunciated has been re-acknowledged, as recently as 1962, by the General Assembly of the United Nations by a vote of 87 to 2 (France and South Africa) with twelve abstentions. (Paragraph 4, Resolution 1803 (XVII)).

With such unflinching unequivocal declarations by our Government, plus the statement of the United Nations just noted, it is a mystery to me how and why the Majority reached the conclusion that Venezuela, engaged in a commercial undertaking as business-like

as a purchase of stock on the exchange or the buying of a consignment of bananas at a plantation, should be awarded an immunity from juridical processes which every department of our government has now recognized as controlling in profit-inspired transactions. I cannot understand why the government of Venezuela is guaranteed an immunity which the United States does not claim in any other country in the world. It is impossible for me to escape the conviction that this kind of a decision on the part of the Majority contributes to international irresponsibility and international disrespect for law.

Whether Venezuela's good will can be purchased by allowing her to defraud American citizens of over $100,-000,000 is not for the courts to decide. Certainly, so far as public reports are concerned, we can take judicial notice of the fact that American flags have been publicly burned in Venezuela and riots and demonstrations have attacked the integrity and good name of the United States. It appears in the litigation that the president of the plaintiff company has been threatened with bodily harm if he returns to Venezuela to protect his investments there. All this certainly does not add up to a demonstration of friendliness to the United States which, ipso facto, should make Venezuela an ally in the Cold War. Anyhow, I repeat, this is not food for us to chew upon. Only the President of the United States can speak on this subject and until the President does so speak, it is the bounden obligation and unavoidable duty of the American courts to adhere to the law as written. And that duty imperatively demands that we allow American citizens to have their rights adjudicated in American courts when they are denied an impartial forum in a foreign court.

This Court's decision promotes the idea of a promiscuous, general allowance of absolute sovereign immunity which could undermine the whole structure of inter-

national trade which depends on prompt liquidation of monetary obligations. No one denies that Venezuela, under its power of eminent domain, could take the plaintiff's property, but it is the most elementary, uncontestable, fundamental ABC of international law that it must make payment for that taking.

No one can question that law is founded on principles of morality, justice and intellectual integrity. We, of course, have the melancholy record of intolerable procedures of the past which were accepted and enforced in the courts. The medieval practices of trial by ordeal, trial by battle and star chamber proceedings can bring the blush of retrospective shame to our profession but no one can deny that the law has now emerged from the dark caverns of monarchical tyranny, scientific ignorance, vacuous superstitions and George Jeffreys despotism. Every decade in the last century has seen ancient incongruities of the law eliminated by statute, court decisions and by the most effective eraser of all, spontaneous, universal refusal to go on with a practice which is intrinsically abhorrent to common sense and fair dealing. Justice FRANKFURTER stated this proposition well when he said that there has been a steady trend toward "subjection of governmental action to the moral judgment. A reflection of this steady shift in attitude toward the American sovereign's immunity is found in such observations in unanimous opinions of this Court as 'Public opinion as to the peculiar rights and preferences due to the sovereign has changed,' . . . 'There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past.' . . . '. . . the present climate of opinion . . . has brought governmental immunity from suit into disfavor.'" (*Republic of China*, p. 359.)

He said further, and most salubriously so, that justice and public morality demand that those who seek

to avoid payment of their debts must submit to the judicial process: "The substantive sweep of amenability to judicial process has likewise grown apace . . . The claims of dominant opinion rooted in sentiments of justice and public morality are among the most powerful shaping-forces in lawmaking by courts. Legislation and adjudication are interacting influences in the development of law. A steady legislative trend, presumably manifesting a strong social policy properly makes demands on the judicial process." (*Republic of China*, p. 360.)

The sovereign immunity doctrine, with the exception clearly spelled out in this opinion, is no longer a healthy manifestation of society. It is, in fact, an excrescence on the body of the law, it encourages irresponsibility to world order, it generates resentments and reprisals. Sovereign immunity is a stumbling block in the path of good neighborly relations between nations, it is a sour note in the symphony of international concord, it is a skeleton in the parliament of progress, it encourages government toward chicanery, deception and dishonesty. Sovereign immunity is a colossal effrontery, a brazen repudiation of international moral principles, it is a shameless fraud.

I believe we should affirm the action of the lower court which judiciously and courageously declined to approve of what the Venezuelean government has done, which, to speak bluntly, constitutes brigandage in violation of international law, condemned by every civilized government in the world. We have here, I cannot repeat too often or emphasize too much, the simplest business transaction and I cannot share the alarm evinced by the Majority Opinion that this litigation portends a crisis of state which conjures up even fear of a war with Venezuela. I cannot see in this dollar-and-cents commercial dealing an international extremity which should compel us to abandon primary princi-

ples of law, elementary concepts of justice, ordinary rules of logic and to turn our backs on our own citizens to enrich a nation which dispossessed American property owners, collected $380,000,000 from the pockets of American taxpayers, opposes allowing American investors a forum in which they may present their claims without apprehension or coercion and whose police condone the burning of the American Flag.

The Majority of this Court, in its final judgment, ignores the plain intendment of the decision of our highest court in the land, in the *Republic of China* case, it in effect defies a solemn act of Congress (78 Stat. 1009), 22 U.S.C. §2370, which is practically the law in the case, and it treats casually the official pronouncement of the State Department itself in Dept. of State Bulletin, volume 26, page 984, which has never been recalled, changed or modified. For these reasons, therefore, I must dissent to what the Majority has done and what, in the face of the dominant law, it has failed to do but should do.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

I think the majority commits error by granting the writ of prohibition. There is no valid reason or necessity for such a procedure, particularly since an appeal pursuant to the Act of March 5, 1925, P. L. 23 (12 P.S. §672 et seq.) was taken and properly raised the question of jurisdiction.

I would determine this matter within the framework of that appeal.

I dissent.